[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Wallace*, Slip Opinion No. 2026-Ohio-112.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2026-OHIO-112

DISCIPLINARY COUNSEL *v.* WALLACE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Wallace*, Slip Opinion No. 2026-Ohio-112.]

*Attorneys—Misconduct—Violations of the Rules of Professional Conduct— Soliciting sexual activity with a client and stating or implying an ability to improperly influence a government agency or official to achieve results— One-year suspension with six months conditionally stayed.*

(No. 2025-1003—Submitted September 16, 2025—Decided January 20, 2026.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2024-023.

_____

The per curiam opinion below was joined by KENNEDY, C.J., and DEWINE, DETERS, HAWKINS, and SHANAHAN, JJ.  FISCHER, J., dissented.  BRUNNER, J., did not participate.

**Per Curiam.**

{¶ 1} Respondent, Bruce Sanford Wallace, of Mount Orab, Ohio, Attorney Registration No. 0010876, was admitted to the practice of law in Ohio in 1983.

{¶ 2} In a September 2024 complaint, relator, disciplinary counsel, alleged that Wallace committed three ethical violations by soliciting sexual activity from a client while promising that her case would get priority if she complied and by implying an ability to improperly influence the judge presiding over the case.

{¶ 3} The parties entered into stipulations of fact, misconduct, and aggravating and mitigating factors, and they jointly proposed that one of the three alleged rule violations be dismissed. They also submitted 13 stipulated exhibits and jointly recommended that Wallace receive a conditionally stayed six-month suspension for his misconduct.

{¶ 4} Wallace was the sole witness to testify at a hearing before a three-member panel of the Board of Professional Conduct. After the hearing, the panel issued a report finding by clear and convincing evidence that Wallace had committed the two stipulated rule violations and unanimously dismissing the third alleged violation. The panel concurred in the parties' stipulated aggravating and mitigating factors and recommended that Wallace be suspended from the practice of law for six months, with the entire suspension stayed on the conditions that he commit no further misconduct and fully comply with his existing contract with the Ohio Lawyers Assistance Program ("OLAP").

{¶ 5} The board adopted the panel's findings of fact, conclusions of law, and recommended sanction but added an additional condition to the stayed suspension—that Wallace be required to pay the costs of these disciplinary proceedings. The parties have jointly waived objections.

{¶ 6} After independently reviewing the board's report and recommendation, the record, and our applicable precedent, we find that the

appropriate sanction for Wallace's misconduct is a one-year suspension, with six months stayed on the conditions recommended by the board.

## MISCONDUCT

{¶ 7} The stipulated evidence and testimony shows that in August 2022, Wallace agreed to represent J.W. in a parenting dispute regarding her three-year-old daughter. J.W. informed Wallace that time was of the essence, as she wanted to file for a court-ordered visitation schedule before her child's father filed in another county.

{¶ 8} On Friday, August 19, Wallace met J.W. for the first time in his office conference room. During that meeting, he asked her numerous questions to the effect of, "How serious are you about getting what you want with your daughter?" and "How far would you be willing to go to get what you wanted?" Although J.W. was unsure what Wallace meant by his questions, she responded that she would do whatever she needed to do to ensure that her daughter was cared for.

{¶ 9} Wallace advised J.W. that he would represent her for a flat fee of $2,500 plus a $240 filing fee, which she would have to pay before he started working on her case. J.W. told him that she had $240 for the filing fee and that she would have the rest of the money after a real-estate closing the following Monday. Wallace agreed to the proposed payment schedule and again asked J.W. if she was serious about doing anything that he asked of her; J.W. assured him that she was serious. Before J.W. left the office, Wallace asked her whether she would be available over the weekend if he needed any additional information to prepare the necessary pleadings. J.W. told Wallace that he could call or text her over the weekend and that she would be available to meet if necessary. J.W. paid Wallace $240 for the filing fee before leaving his office.

{¶ 10} On Saturday, Wallace sent J.W. a text message identifying himself and stating that he was checking in, that he assumed J.W. had not been served with papers, and that he wanted to make sure that she had thought through the process.

J.W. responded, "[Y]es, I've thought this process through. I will do whatever I need to make sure my child is with the parent that actually provides, loves and wants to be with her."

{¶ 11} Later that day, Wallace called J.W. to see if she was open to doing anything he could possibly ask of her to obtain her objective. J.W. replied that she was willing to do whatever he needed her to do, and Wallace reiterated that he wanted to make sure there were no lines she would not cross or anything she would not do. He also told J.W. that he had "connections" and that the juvenile-court judge who would preside over her custody case was a former coworker and that Wallace used to be his boss. In fact, the Brown County Probate and Juvenile Court judge had previously worked as an associate in Wallace's law office. Wallace claimed that he had favors that he could call in but that he wanted to be sure J.W. was someone on whom he should use a favor. J.W. told him that she was glad to have him as her lawyer.

{¶ 12} J.W. again reassured Wallace that she would do anything to ensure that she remained her daughter's custodial parent, and he told her that she could come into the office so that they could discuss some things and see how far she was willing to go. After arranging childcare, J.W. went to Wallace's office by herself. Before entering, she set her cellphone to record their meeting because she was "uneasy" about what Wallace might ask of her.

{¶ 13} When J.W. arrived, Wallace was the only person in the office. The meeting began in the conference room, with Wallace once again asking J.W. how serious she was. J.W. asked him, "What have you got for me?" Wallace responded, "You—you tell me. I just want to make sure where the line is," to which J.W. replied, "There is no line."

{¶ 14} Wallace and J.W. discussed her case for 15 to 20 minutes before Wallace redirected the conversation to what J.W. was willing to do to demonstrate her "seriousness" about her case. He then instructed her to leave her belongings in

the conference room and led her down a hallway to his personal office, which had a desk and a couch. According to the grievance J.W. filed with relator, she became highly uncomfortable at this point.

{¶ 15} As Wallace walked down the hallway with J.W., he asked her how many tattoos she had and whether she would let him see them. When J.W. turned around to show him a tattoo on her lower back, Wallace discovered her cellphone in the back pocket of her shorts. He pulled up J.W.'s shirt and grabbed the phone from her pocket, saying, "Here. Hang on. I'll just get this out of here. These things make me nervous." Wallace told J.W., "I'm going to put this back up here, if that's okay," and began walking back down the hallway with J.W.'s phone. J.W. told him that he could not take her phone because her mother had her daughter and might need to reach her.

{¶ 16} Wallace then redirected the conversation back to where J.W.'s "line" was and whether she was going to change her mind about filing the motion to establish parenting time. He explained that he would prioritize her case, but only if she was "serious enough" and could assure him that she would not "back out." J.W. pledged, "[t]here's no backing out," and she reiterated the gravity of the custody dispute and how important it was to her to protect her daughter. Wallace then sought to clarify that there was nothing—not even something "personal"—that he could ask of J.W. that she was not willing to do. He then invited her to "show" him how serious she was. J.W. indicated that she would do anything and asked Wallace to tell her what he wanted. Wallace replied, "In my position I am not in a place where I can do that," and he told J.W., "I have to leave that to you."

{¶ 17} J.W. understood that Wallace wanted her to engage in physical contact and/or sexual activity with him, and at his disciplinary hearing, Wallace admitted that he was "asking her to engage in a sex act." She asked him what would happen after she did "the thing," and he replied, "Your case gets priority." J.W. probed Wallace to find out what would happen if she did not cooperate, and he

stated that he would still handle her case but suggested that it may not get priority scheduling.

{¶ 18} Wallace led J.W. back to the conference room where he again invited her to "offer" what she was willing to do. J.W. stated that she was going to "wing it," but instead of telling Wallace what she was willing to do, she said, "I don't know now that I am under pressure. You can't say what you want, so I can't tell you my secrets of what I was going to do." Wallace, replied, "Okay. You understand I'm not allowed to do that." After J.W. stated that she understood, Wallace told her, "I'm not making my representation of you in any way conditional on this. That's—that's not—we don't do that, okay?" before telling her, "I was just trying to see how serious you were going to be. That's all."

{¶ 19} Wallace attempted to get J.W. to leave her cellphone in the conference room and return to his personal office, once again declaring, "Those things make me nervous." But J.W. refused. Before J.W. left the office, Wallace asked that she inventory her tattoos and text him "with a number . . . or pictures of all of them." J.W. did not comply with his request.

{¶ 20} On August 26, 2022, Wallace paid the $240 filing fee and filed a motion to establish parenting time in the Brown County Probate and Juvenile Court on J.W.'s behalf. Less than a month later, J.W. texted Wallace to request that the motion be dismissed. With J.W.'s consent, Wallace waited until a few days before the scheduled hearing to dismiss the motion. Wallace did not charge J.W. for any of the work he performed on her case.

{¶ 21} The parties stipulated and the board found by clear and convincing evidence that Wallace's conduct violated Prof.Cond.R. 1.8(j) (prohibiting a lawyer from soliciting or engaging in sexual activity with a client unless a consensual sexual relationship existed between them prior to the client-lawyer relationship) and 8.4(e) (prohibiting a lawyer from stating or implying an ability to improperly influence a government agency or official or to achieve results by means that violate

the Ohio Rules of Professional Conduct or the law). We adopt the board's findings of misconduct.

**RECOMMENDED SANCTION**

{¶ 22} When imposing sanctions for attorney misconduct, we consider all relevant factors, including the ethical duties that the lawyer violated, the aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases.

{¶ 23} The parties stipulated and the board found that three aggravating factors are present in this case—Wallace acted with a dishonest or selfish motive, committed multiple offenses, and harmed a vulnerable victim. *See* Gov.Bar R. V(13)(B)(2), (4), and (8). In her grievance, J.W. wrote, "I have never in my life felt so violated by someone just by their ability to dance around what they wanted without saying what they wanted." She explained, "I know that any parent would go to the ends of the earth for their child. But to be a good parent doesn't mean that they should have to 'voluntarily' give something of themselves to a man that they are already paying or planning to pay to represent them."

{¶ 24} As for mitigating factors, the parties stipulated and the board found that Wallace had no prior discipline in his 41 years of practice, made full and free disclosure to the board and exhibited a cooperative attitude toward the disciplinary proceedings, and presented evidence of his good character or reputation. *See* Gov.Bar R. V(13)(C)(1), (4), and (5). Wallace's character evidence consisted of seven letters—one from a judge, two from attorneys, and four from friends, at least one of whom was also a former client—who attested to Wallace's good character, reputation, and extensive history of dedicated community service. In addition, the board noted that Wallace exhibited remorse for his actions and acknowledged the seriousness of his misconduct.

{¶ 25} We note that Wallace also has submitted evidence showing that he experienced a mental-health crisis *after* the board certified the formal complaint

against him and that he has since been diagnosed with and treated for anxiety and depression. He entered into a two-year mental-health contract with OLAP in October 2024, and his treatment professional has opined that he is fit to practice law. However, Wallace did not seek to establish either of his diagnosed disorders as a mitigating factor—nor could he, because he submitted no evidence that his disorders contributed to cause his misconduct. *See* Gov.Bar R. V(13)(C)(7).

{¶ 26} In their stipulations, the parties compared the facts of this case to three others in which we imposed conditionally stayed six-month suspensions on attorneys who made inappropriate sexual advances toward their clients. *See Cleveland Metro. Bar Assn. v. Paris*, 2016-Ohio-5581 (imposing a conditionally stayed six-month suspension on an attorney who made unwelcome sexual advances toward a female client and neglected her case by failing to appear at her criminal-sentencing hearing); *Disciplinary Counsel v. Hubbell*, 2015-Ohio-3426 (imposing a conditionally stayed six-month suspension on an attorney who attempted to initiate a romantic relationship with a client he was representing pro bono in a custody dispute); *Toledo Bar Assn. v. Burkholder*, 2006-Ohio-2817 (imposing a conditionally stayed six-month suspension on an attorney who relentlessly asked a client to go out with him over a period of months, made a sexually suggestive comment to her, and inappropriately touched her on a single occasion). Relying on *Paris*, *Hubbell*, and *Burkholder*, the board recommends that we suspend Wallace from the practice of law for six months, fully stayed on the conditions that he refrain from further misconduct, remain in compliance with his two-year OLAP contract, and pay the costs of these disciplinary proceedings.

{¶ 27} "We have consistently disapproved of the conduct of lawyers who have solicited or engaged in sexual activity with their clients even before the adoption of Prof.Cond.R. 1.8(j), and depending on the relative impropriety of the situation, we have imposed a wide range of disciplinary measures for such conduct." *Paris* at ¶ 18, citing *Akron Bar Assn. v. Miller*, 2011-Ohio-4412, ¶ 18.

In *Paris*, we noted that we have imposed sanctions ranging from public reprimands to permanent disbarment on lawyers who have engaged in inappropriate sexual conduct with their clients. *Id.*, citing *Disciplinary Counsel v. Engler*, 2006-Ohio-3824 (publicly reprimanding an attorney who had two consensual sexual encounters with a client while representing her in a divorce)[1] and *Disciplinary Counsel v. Sturgeon*, 2006-Ohio-5708 (disbarring an attorney who solicited sex from clients in exchange for a reduced legal fee, made inappropriate sexual comments to clients, touched them in a sexual manner, exposed himself to one of his clients, and lied repeatedly during the disciplinary process). And we acknowledged that "[i]n between those two extremes, we typically impose term suspensions with all or part of the suspension stayed, depending on the severity of the misconduct and the applicable aggravating and mitigating factors." *Id.* at ¶ 19, citing *Disciplinary Counsel v. Bunstine*, 2013-Ohio-3681, ¶ 32.

{¶ 28} In this case, the parties relied only on *Paris*, *Hubbell*, and *Burkholder* to support their proposed sanction of a conditionally stayed six-month suspension. They also identified and sought to distinguish three other cases in which we imposed one-year suspensions with or without partial stays on attorneys who, like Wallace, made unwelcome sexual advances toward a client. *See Disciplinary Counsel v. Dugan*, 2024-Ohio-5118; *Bunstine*; *Disciplinary Counsel v. Detweiler*, 2013-Ohio-1747. While the parties have suggested that Wallace's misconduct was less severe than the conduct at issue in those cases, we find those cases relevant and instructive.

---

1. We have since emphasized that "[t]he fact that a client appears to have consented does not mitigate the attorney's misconduct or provide a defense against a violation." *Disciplinary Counsel v. Sarver*, 2018-Ohio-4717, ¶ 16; *see also id.*, quoting Prof.Cond.R. 1.8(j), Comment 17 (explaining that "'[Prof.Cond.R. 1.8(j)] prohibits the lawyer from engaging in sexual activity with a client *regardless of whether the relationship is consensual and regardless of the absence of prejudice to the client*, unless the sexual relationship predates the client-lawyer relationship'" [emphasis added in *Sarver*]).

**{¶ 29}** In *Dugan*, the attorney stipulated to a single violation of Prof.Cond.R. 1.8(j) after he, over a period of months, sent a female domestic-relations client whom he was representing pro bono a series of sexually explicit text messages in which he repeatedly solicited sexual activity with her. *Dugan* at ¶ 4-6, 10. Aggravating factors consisted of a public reprimand more than 15 years earlier, Dugan's selfish motive, and the harm he caused to a vulnerable client. *Id.* at ¶ 17-19. Those factors were balanced against mitigating evidence of Dugan's efforts to seek interim rehabilitation for his excessive alcohol use, his full and free disclosure to the board and cooperative attitude toward the disciplinary proceedings (including his expressions of genuine remorse and acceptance of responsibility for his misconduct), and evidence of his good character and reputation. *Id.* at ¶ 20-24. We imposed a conditionally stayed one-year suspension on Dugan for his misconduct. *Id.* at ¶ 32.

**{¶ 30}** In *Bunstine*, the attorney suggested that his female client in a child-custody case could pay her legal fees by getting rid of her fiancé, finding a babysitter for her children, and answering her door naked. He later went to the client's house to see what would happen, but he left after being confronted in the driveway by the client's fiancé and the fiancé's father. We found that Bunstine improperly solicited sexual activity from his client and that his conduct adversely reflected on his fitness to practice law. *Bunstine*, 2013-Ohio-3681, at ¶ 25. Like Wallace, Bunstine acted with a selfish motive and harmed a vulnerable client, but he also had a history of prior discipline. *Id.* at ¶ 28. Additionally, Bunstine attempted to blame his client for his misconduct and made excuses for his inappropriate proposition to her. *Id.* at ¶ 18. No mitigating factors were present. We suspended Bunstine from the practice of law for one year with six months conditionally stayed. *Id.* at ¶ 34.

**{¶ 31}** And finally, in *Detweiler*, the attorney made repeated unsolicited and unwelcome personal and sexual advances by text message, over a period of several

months, toward a financially vulnerable client. When the client ignored those advances, Detweiler sent her a nude photograph of himself in a state of sexual arousal. In addition to finding a violation of Prof.Cond.R. 1.8(j), we found that Detweiler's improper sexual advances adversely reflected on his fitness to practice law and created a conflict of interest that materially limited his ability to carry out an appropriate course of action for the client. *Detweiler*, 2013-Ohio-1747, at ¶ 9-10.

{¶ 32} Like Wallace, Detweiler acted with a selfish motive and caused harm to a vulnerable client, *id*. at ¶ 12; but we also found that Detweiler had previously been disciplined for engaging in an improper sexual relationship with another client and that his combined behavior from his two disciplinary cases constituted a pattern of misconduct, *id*. As for mitigating factors, Detweiler exhibited a cooperative attitude toward the disciplinary proceedings, acknowledged the severity of his misconduct, and expressed remorse for his actions. *Id*. We suspended Detweiler from the practice of law for one year and conditioned his reinstatement on the submission of proof that he had submitted to an OLAP evaluation and complied with any resulting treatment recommendations. *Id.* at ¶ 21.

{¶ 33} In this case, Wallace's repeated and inappropriate sexual overtures occurred over a period of two days rather than months like those of Dugan and Detweiler. They were, however, far more coercive than Dugan's repeated inappropriate text messages and Bunstine's singular proposition and subsequent appearance at his client's home. During Wallace's first meeting with J.W. on a Friday, he pressed J.W., inquiring as to how serious she was about pursuing her case and asking her things like, "How far would you be willing to go?" During a phone call the next morning, Wallace continued that line of questioning and suggested that he could use his personal relationship with the judge to improperly influence the outcome of J.W.'s case. Wallace then lured J.W. to his office, which was closed for the weekend, to discuss how far she was willing to go. After J.W.

arrived at his office alone, Wallace discussed her case for approximately 20 minutes and then attempted to isolate her from her cellphone before escorting her down the hallway to his personal office. There, he repeatedly pressed J.W. to perform sexual favors for him in exchange for making her case a priority.

{¶ 34} There can be no doubt that Wallace understood that his conduct with J.W. violated his ethical duties as an attorney. He told her as much when he declined to answer her questions about exactly what he wanted from her—first telling her, "In my position I am not in a place where I can do that . . . I have to leave that to you," and later stating, "Okay. You understand I'm not allowed to do that." Yet in his initial response to relator's letter of inquiry regarding J.W.'s grievance, Wallace claimed that his intention was to "get [J.W.] to realize the importance of this endeavor" and encourage her to seek financial assistance from friends, family, or other sources to secure his retainer. At that time, he expressly denied that he had "any inappropriate intent, motive or plan." He admitted his true intentions only *after* he heard J.W.'s recording of their conversation—though in his disciplinary-hearing testimony, he stated that he believed his response to the letter of inquiry "was [his] honest recollection at the time."

{¶ 35} On these facts, we conclude that Wallace's repeated and brazen attempts to convince J.W. to engage in sexual conduct with him, coupled with his suggestion that he could use his relationship with the judge to influence J.W.'s case, warrant a sanction greater than the conditionally stayed six-month suspension recommended by the parties and the board. After examining our decisions in *Paris*, *Dugan*, *Bunstine*, and *Detweiler*, we believe that a one-year suspension, with six months stayed on the conditions recommended by the board, is necessary to convey the seriousness of Wallace's offenses and to protect the public from further misconduct.

## CONCLUSION

{¶ 36} Accordingly, Bruce Sanford Wallace is hereby suspended from the practice of law in Ohio for one year, with six months stayed on the conditions that he engage in no further misconduct, pay the costs of these proceedings, and remain in compliance with the two-year OLAP contract he entered on October 23, 2024. If Wallace fails to comply with the conditions of the stay, the stay will be revoked and he will serve the entire one-year suspension. Costs are taxed to Wallace.

Judgment accordingly.

————————————

Joseph M. Caligiuri, Disciplinary Counsel, and Martha S. Asseff and Paige A. Melton, Assistant Disciplinary Counsel, for relator.

Kegler Brown Hill & Ritter, L.P.A., and Christopher J. Weber, for respondent.

————————————